IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HEARTSTATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02 C 5994 |
| v. | ) | |
| | ) | Judge Ronald A. Guzmán |
| J.L. INDUSTRIES, INC., | ) | |
| and POTTER-ROEMER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Heartstation, Inc. ("Heartstation") has sued defendants J.L. Industries, Inc., ("J.L.") and Potter-Roemer ("Potter") for infringement of U.S. Patent Nos. 6,301,501 ("the '501 Patent") and 6,735,473 ("the '473 Patent"), which are directed to storage cabinets for heart defibrillators. The case is before the Court for construction of the claim terms the parties dispute.[1]

### Background

On June 17, 1999, Heartstation filed patent application no. 09/335,149 for a protective defibrillator storage device with alarm signal. (*See* Exs. Potter's Opening Br. Supp. Claim Constr., Ex. B1, Patent Application at 1.) Ultimately, that application issued as the '501 Patent.

On October 05, 2001, Heartstation filed patent application no. 09/971,461 for a protective defibrillator storage device with alarm signal. (*See id.*, Ex. D1, Patent Application at 1.) This

---

[1] In their Amended and Consolidated Joint Statement on the Issue of Claim Construction, the parties identified twenty-three disputed terms. In their briefs, however, defendants addressed only thirteen of those terms. Accordingly, the Court addresses only the thirteen terms discussed in defendants' briefs and deems them to have waived their objections to plaintiff's construction of any other terms.

application was a continuation-in-part of the '501 patent application. (*See id.*) Initially, the PTO rejected the claims of this application:

> Claims 1-21 are rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claims 1-25 of [the '501 Patent]. Although the conflicting claims are not identical, they are not patentably distinct from each other because the current claims are an obvious broadening of or are an obvious variant of the patented claims.

(*Id.*, Ex. D12, 4/16/03 Office Action at 2.) To overcome this rejection, Heartstation filed a terminal disclaimer in which it agreed that any patent that issued as a result of the application would expire at the same time as the '501 Patent. (*Id.*, Ex. D15, Terminal Disclaimer.) Ultimately, the application issued as the '473 Patent.

## Discussion

To determine the meaning of disputed claim language, the Court begins with an examination of the intrinsic evidence, which consists of the patent claims, specification and prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Extrinsic evidence may be used only if the Court cannot determine the meaning of the claims from the intrinsic evidence alone. *Id.* at 1583.

The words used in a claim are generally given their ordinary meaning to one skilled in the relevant art. *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999). The ordinary meaning may be established using a dictionary, as long as the definition is not contrary to any definition found within the patent documents. *CCS Fitness v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).

## Defibrillator Mount

The parties dispute the meaning of the term "defibrillator mount," which appears in claims 1, 8 and 14 of the '501 Patent and claims 1 and 15 of the '473 Patent. Claim 1 of the '501 Patent claims:

> A protective defibrillator storage device . . . comprising: . . .
>
> a defibrillator mount connected to an interior surface of the enclosure positioned to allow full view of a defibrillator through the translucent material, the defibrillator mount having first and second retaining members, the first retaining member angularly extending from the interior surface toward the second retaining member, the second retaining member vertically adjacent the first retaining member extending substantially perpendicular from the interior surface having a retaining lip angularly extending from the second retaining member toward the first retaining member.

(Exs. Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Claim 1, Col. 5, ll. 56-57 & Col. 6, ll. 3-13.) Claims 8 and 14 claim "a defibrillator mount . . . connected to an interior surface of the enclosure." (*See id.*, Claim 8, Col. 7, ll. 4-5; Claim 14, Col. 7, ll. 59-60.) Claim 1 of the '473 Patent claims a protective defibrillator storage device comprising, among other things, "a defibrillator mount connected to an interior surface of the enclosure having at least one holding member, the holding member positioning the defibrillator within the interior compartment such that the defibrillator can be readily viewed through the translucent material of the door." (*Id.*, Ex. C, '473 Patent, Claim 1, Col. 7, ll. 17-20, 36-41.) Claim 15 is the same except that it claims a protective defibrillator storage device in combination with a defibrillator and the word "readily" is deleted from the last line. (*Id.*, Col. 9, ll. 8-12.) Neither Patent defines the term "defibrillator mount."

Heartstation says defibrillator mount is "a means to support a defibrillator in a raised position." (Pl.'s Initial *Markman* Mem. Regarding Claim Constr. at 4 (quotation omitted).) Potter says the term means "[a] bracket that holds and supports the defibrillator in a 'raised position' (i.e.,

3

a position at least above the bottom interior surface of the enclosure)" that is "structurally distinct from the interior surfaces (top, bottom, back and side walls) of the enclosure." (Potter's Opening Br. Supp. Claim Constr. at 4.) J.L. proposes the following construction:

> A bracket fastened or fixed to a vertical interior surface of the enclosure to suspend the defibrillator in a raised position above the bottom and secure the defibrillator within the interior of the cabinet, where the bracket allows for little movement of the defibrillator within the interior compartment of the enclosure.

(J.L.'s Mem. Supp. Claim Constr. at 8.)

The parties assume that defibrillator mount has the same meaning in both Patents. But there are significant differences between the claim language and specifications of each Patent. For example, claim 1 of the '501 Patent specifically describes the structure of the claimed mount as having two retaining members, the first of which extends angularly from the interior surface toward the second, and the second of which is vertically adjacent to the first, extends substantially perpendicularly from the interior surface and has a retaining lip that extends angularly toward the first. Claims 1 and 15 of the '473 Patent say the claimed mount consists of at least one holding member that positions the defibrillator so that it can be easily viewed through the door. Thus, the claims of the '473 Patent define defibrillator mount far more broadly than does claim 1 of the '501 Patent.

The specifications of the two Patents, which are otherwise quite similar, also diverge in their discussions of the defibrillator mount. The '501 Patent says the defibrillator mount "should hold the defibrillator in place and allow for little movement of the defibrillator within the interior of the compartment." (Exs. Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Col. 2, ll. 35-37; *see id.*, Col. 4, ll. 7-10 (stating that in the preferred embodiment, the mount "should be capable of holding the defibrillator in place and allow for little movement of the defibrillator within the

4

interior compartment." ).) The specification of the '473 Patent, on the other hand, says nothing about the stability of the defibrillator. Rather, it says that the defibrillator mount "should hold the defibrillator so as to provide greater visibility of the defibrillator within the interior compartment." (*Id.*, Ex. C, '473 Patent, Col. 3, ll. 31-33; *see id.*, Col. 5, ll. 27-29 (stating that in the preferred embodiment, the mount "positions the defibrillator within the enclosure . . . so that the defibrillator may be readily viewed through the transparent portion of the door").)

The descriptions of the preferred embodiments are also different. The '501 Patent identifies the mount of the preferred embodiment as "a U-shaped bracket" but states that "various other types of brackets or holders may be used." (*Id.*, Ex. A, '501 Patent, Col. 4, ll. 12-15.) The '473 specification says that different embodiments of the mount are contemplated, the first being the mount claimed in claim 1 of the '501 Patent and an alternative consisting of "at least one holding member . . . extending generally perpendicularly from an interior surface of the enclosure [that] hold[s] the defibrillator within the enclosure so that it can be readily viewed through the . . . door." (*Id.*, Ex. C, '473 Patent, Col. 3, ll. 45-50.)

Ordinarily, a term that appears in two related patents is presumed to have the same meaning in both. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."). But the significant differences in the claims and specifications of the '501 and '473 Patents discussed above overcome that presumption with respect to the term defibrillator mount. Thus, we will construe that term separately for each Patent.

**'501 Patent**

Claim 1 of the '501 Patent does not limit defibrillator mount to a bracket as defendants contend. The defibrillator mount is a bracket in the preferred embodiment, but the preferred embodiment does not limit the claims. *See Toro Co.*, 199 F.3d at 1301 ("It is well established that the preferred embodiment does not limit broader claims that are supported by the written description."). Rather, any device that meets the elements of claim 1 can be a defibrillator mount. (*See* Exs. Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Col. 4, ll. 12-15 ("In the preferred embodiment, the defibrillator mount . . . is a U-shaped bracket, but there are various other types of brackets or holders which may be used to secure the defibrillator within the interior compartment.").)

While defendants' construction is too narrow, plaintiff's is too broad. Defining defibrillator mount as "a means to support a defibrillator" ignores the express limitations of the claim. Claim 1 does not contemplate *any* means to support a defibrillator, but a device with two retaining members, the first of which extends angularly from the interior surface toward the second, and the second of which is vertically adjacent to the first, extends perpendicularly from the interior surface and has a retaining lip that extends angularly toward the first. (*See id.*, Claim 1, Col. 6, ll. 3-13.) Given the express limitations of the claim, plaintiff's construction is untenable.

The last part of plaintiff's definition – "in a raised position" – is also too broad. That definition would encompass a defibrillator storage device in which the defibrillator mount, and thus the machine itself, rests on the bottom of the enclosure. Though such a device falls literally within the claim language, *see id.*, Claim 1, Col. 6, l. 3; Claim 8, Col. 7, ll. 4-5; Claim 14, Col. 7, ll. 59-60, Heartstation relinquished any claim to such a device during the prosecution of the Patent.

When Heartstation filed the patent application, the defibrillator mount portion of claim 1 said: "[A] defibrillator mount . . . connected to an interior surface of the enclosure." (Exs. Potter's Opening Br. Supp. Claim Constr., Ex. B1, '501 Patent Application at 11.) The PTO rejected that claim:

> Claims 1-3, 5, 6, 8-11 and 13 are rejected under 35 U.S.C. 103(a) as being unpatentable over [the Fudge Patent] in view of US [Patent No.] 5388570 to Wassil. The Fudge device discloses the invention substantially as claimed less a visual alarm and key switch to deactivate the alarm. Substituting or combining alarm types, in general, amounts to an obvious design choice. In any event, Wassil teaches a similar alarm cabinet having both visual and audible alarms for the implicit benefit of enhanced notification effect.

(*Id.*, Ex. B3, 10/11/00 PTO Office Action at 3.)

To overcome the rejection, plaintiff submitted claim 1 in its current form. Plaintiff explained the amendment as follows:

> The claim language of claim 1 has been amended to more clearly define the claimed invention and distinguish the claimed invention from the prior art. . . . This amended claim language further defines the defibrillator mount by claiming retaining members in vertical relationship that mount the defibrillator within the enclosure to allow full view of the defibrillator. This amended claim language distinguishes the claimed invention from the '250 [Fudge] Patent primary reference.

> The '250 Patent discloses an enclosure for housing a fire extinguisher with an electrically energizable warning device connected to the enclosure that has a resilient member to grip the body of the fire extinguisher. The resilient member merely holds the fire extinguisher in place with the fire extinguisher resting on the floor of the enclosure and does not promote awareness of the fire extinguisher. In patentably distinct contrast, the defibrillator mount retains the defibrillator within the enclosure in a location that provides improved viewability of the contents of the enclosure, thus promoting greater awareness of what type of equipment is inside the enclosure. Although differing sizes of defibrillators are contemplated to be used with the claimed invention, smaller defibrillators would not easily be viewed if held by the resilient member disclosed by the '250 Patent. The claim language as amended claims an enclosure with a defibrillator mount that holds the defibrillator in a location within the enclosure that makes the defibrillator more readily viewable.

7

(*Id.*, Ex. B5, 2/9/01 Amendment A at 6-7.) In light of that explanation, the PTO approved amended claim 1.

Heartstation says the amendment did not relinquish its claim to a device in which the defibrillator rests on the floor of the enclosure. Rather, Heartstation says:

> [it] differentiated [the Fudge '250 patent] because the resilient member that gripped the fire extinguisher in the '250 patent did not promote awareness of the fire extinguisher. By contrast, in this case, the defibrillator mount was intended to make the defibrillator more readily viewable, and this is what distinguishes Heartstation's defibrillator mount from the '250 patent.

(Pl.'s Reply *Markman* Mem. Regarding Claim Constr. at 3.) But Heartstation told the PTO that the defibrillator mount was superior to the resilient member of the Fudge patent because "[t]he resilient member merely holds the fire extinguisher in place *with the fire extinguisher resting on the floor of the enclosure*" while "the defibrillator mount retains the defibrillator within the enclosure *in a location* that provides improved viewability of the contents of the enclosure." (Exs. Potter's Opening Br. Supp. Claim Constr., Ex. B5, 2/9/01 Amendment A at 7 (emphasis added).) Read in context, Heartstation's statement can only mean that the defibrillator mount improves visibility because it raises the defibrillator off of the bottom of the enclosure. Having made that representation to the PTO to overcome an obviousness rejection, Heartstation must now live with it. *See Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 994 (Fed. Cir. 2003) ("It is well established that the prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.") (quotation omitted).

The Court also agrees with defendants that the defibrillator mount is distinct from the walls of the enclosure. Claim 1 of the '501 Patent claims a device that contains both an enclosure, which is comprised of "a plurality of wall sections, a top section, a bottom section and a door section" and a defibrillator mount. (Exs. Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Claim

1, Col. 5, l. 56-Col. 6, l. 13.) The fact that each device is claimed to have a plurality of sections forming a compartment *and* a defibrillator mount suggests that they are separate elements. Further, claims 8 and 14 state that the defibrillator mount is "connected to an interior surface of the enclosure." (*Id.*, Claim 8, Col. 7, ll. 4-5; Claim 14, Col. 7, ll. 59-60.) If the mount and the surface of the enclosure are not separate elements, then claims 8 and 14 teach an absurdity: that an element of the device must be connected to itself.

Defendants also contend that the defibrillator mount must hold as well as support the defibrillator. None of the claims explicitly contains that requirement, but the specification says that the mount should "hold[ ] the defibrillator in place." (*Id.*, Col. 4, ll. 7-10.)

Heartstation does not quarrel with the specification but says that "hold" need not mean grasp or restrain, as defendants contend. Rather, Heartstation argues, it can also mean "support," and urges the Court to adopt that definition. (*See* Pl.'s Reply *Markman* Mem. Regarding Claim Constr. at 1-2.)

The Court declines to do so. Claim 1 does not claim a mount that consists of two parallel ledges. Rather, it claims a mount comprised of two retaining members that are connected to an interior surface, the first of which is angled toward the second and the second of which has a retaining lip that is angled toward the first. (Exs. Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Claim 1, Col. 6, ll. 3-13.) As a result, the mount is smaller at the opening than at its base, creating a shape that is not rectangular, as two shelves typically would, but one that is almost trapezoidal. (*See id.*, Figs. 2 & 3, No. 17.) Thus, once the defibrillator passes through the smaller opening and reaches the larger base, the angle of the first retaining member and the angled lip of the second hold it there. In short, some degree of grasping is inherent in the shape and features of the mount claimed in claim 1.

9

This interpretation of the claim is borne out by the specification, which says that the mount should "hold[ ] the defibrillator in place and allow for little movement of the defibrillator within the interior compartment." (*Id.*, Col. 4, ll. 7-10.) It also states that the defibrillator mount, in the preferred embodiment, "is a U-shaped bracket, but there are various other types of brackets or holders which may be used to *secure* the defibrillator within the interior compartment." (*Id.*, ll. 12-15) (emphasis added). The invention's stated aim of securing the defibrillator within the enclosure in a manner that allows it little movement is accomplished only if the mount grasps the machine in some way instead of just providing support for it.[2]

Heartstation insists, however, that interpreting the Patent as requiring the mount to grasp the defibrillator will defeat another stated goal of the mount: "[T]o allow for the quick removal of a defibrillator in the event of a cardiac arrest." (Pl.'s Reply *Markman* Mem. Regarding Claim Constr. at 2.)

The Court disagrees. Though some amount of grasping is inherent in the angle/lip-mount combination set forth in claim 1, that does not mean the mount must exert an unbreakable grip on the defibrillator. Indeed, read in light of the specification, as it must be, the mount element cannot exert great force over the machine. Because the specification says that the mount must release the defibrillator easily, the grasp produced by the mount claimed in claim 1 must be such that the machine can be readily removed when it is needed.

In sum, the "defibrillator mount" claimed in claims 1, 8 and 14 of the '501 patent is a device: (1) with two retaining members, the first of which extends angularly from the interior surface toward

---

[2] Potter argues that Heartstation relinquished any claim to a device that merely holds the defibrillator during the prosecution of the '473 Patent. (*See* Potter's Opening Br. Supp. Claim Constr. at 5-6.) As discussed in detail below, the Court rejects this argument.

the second, and the second of which is vertically adjacent to the first, extends perpendicularly from the interior surface and has a retaining lip that extends angularly toward the first; (2) that supports and holds the defibrillator; (3) in a position above the bottom surface of the enclosure; and (4) is distinct from the interior surfaces of the enclosure.

### '473 Patent

The parties' proffered definitions of defibrillator mount are also untenable for the '473 Patent. As noted above, claims 1 and 15 claim "a defibrillator mount . . . having at least one holding member [that] position[s] the defibrillator within the interior compartment such that the defibrillator can be readily viewed through the translucent material of the door." (Exs. Potter's Opening Br. Supp. Claim Constr., Ex. C, '473 Patent, Claim 1, Col. 7, ll. 17-20, 36-41; Claim 15, Col. 9, ll. 8-12.) Heartstation's definition, "a means to support a defibrillator in a raised position," ignores the holding member limitation.

Defendants' definitions are similarly inapt. Both equate the mount with a bracket and both construe the mount as a bracket that grasps the defibrillator. (*See* Potter's Opening Br. Supp. Claim Constr. at 4; J.L.'s Mem. Supp. Claim Constr. at 8.) Neither of those limitations is inherent in the claims. The '473 Patent claims any mount with at least one holding member that positions the defibrillator so that it can be readily seen through the compartment door. A bracket would fall within those claims as would other devices that grasp, but the claims are not limited to those structures.

The fact that the claims are not so limited is illustrated by the specification. Unlike that of the '501 Patent, the specification of the '473 Patent does not say that the claimed defibrillator mount will hold the defibrillator in a manner that "allow[s] for little movement of the defibrillator within

11

the interior compartment." (*See* Exs. Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Col. 2, ll. 35-39; Col. 4, ll. 7-10.) Instead, it says that the defibrillator mount "should hold the defibrillator so as to provide greater visibility of the defibrillator within the interior compartment" and "positions the defibrillator within the enclosure so that the defibrillator may be readily viewed through the transparent portion of the door." (*Id.*, Ex. C, '473 Patent, Col. 3, ll. 31-33; Col. 5, ll. 27-29.) A mount that grasps is not required to achieve the stated goal of increasing the defibrillator's visibility.

We are also not persuaded that Heartstation relinquished any claim to a non-grasping mount during the prosecution of the '473 Patent. Claim 15, as Heartstation originally submitted it, claimed:

> A protective defibrillator storage device in combination with a defibrillator, the combination comprising:
>
> an enclosure comprising a plurality of wall sections, a top section, a bottom section and a door section, the wall sections, top section, bottom section and door section defining an interior compartment of sufficient size to house a defibrillator;
>
> a defibrillator, the defibrillator placed within the interior compartment of the enclosure.

(*Id.*, Ex. D1, '473 Patent Application at 20.) The PTO rejected the claim "as being clearly anticipated by Bishay, US- [Patent No.] 6,293,962." (*Id.*, Ex. D12, 4/16/03 PTO Office Action at 3.)

The Bishay Patent claims a method of maintaining an electrotherapy device by using an environmental carrying case. (*Id.*, Ex. I, Bishay Patent, Col. 3, ll. 12-17.) In the preferred embodiment, the door of the carrying case has "one or more ledges . . . on which the device sits" so that "when the door . . . is opened, the ledge . . . rotates the device out of the container . . . so that the device handle is quickly and easily reachable during deployment." (*Id.*, Col. 4, ll. 14-19.)

12

In response to the PTO's rejection, Heartstation amended claim 15 to its current form. Heartstation explained the amendment as follows:

> Applicants respectfully traverse the rejection of claim 15. Claim 15 has been amended to claim
>
> *"the door partially constructed of a translucent material allowing the interior compartment to be viewed with the door closed"* and
>
> *"a defibrillator mount connected to an interior surface of the enclosure having at least one holding member positioning the defibrillator within the interior compartment such that the defibrillator can be viewed through the translucent material of the door."*
>
> This claim language patentably distinguishes claim 15 from the teachings of the [Bishay] Patent as well as the combined teachings of all the prior art references cited by the Examiner in the Office Action dated April 22, 2003 in that the prior art does not teach or suggest constructing a portion of the enclosure door out of a translucent material and including a defibrillator mount within the enclosure so that a defibrillator may be viewed from outside of a closed enclosure. Therefore, Applicants are of the opinion that claim 15 is in immediate condition for allowance and such action is kindly requested.

(*Id.*, Ex. D14, 9/19/03 Amendment A at 10-11 (emphasis in original).) In defendants' view, that statement is tantamount to an admission by plaintiff that its holding member is not a ledge as described in the Bishay Patent.

The Court disagrees. Heartstation's statement stresses the location of the mount – inside the enclosure versus on the door – not its form. Indeed, the form of the mount is never even mentioned. Given its silence on the subject, plaintiff's statement to the PTO is not the "clear and unmistakable" disavowal required to limit its claim. *Omega Eng'g, Inc.*, 334 F.3d at 1325-26.

The Court agrees with defendants, however, that claims 1 and 15 describe a mount that is structurally distinct from the interior surfaces of the enclosure. (*See* Exs. Potter's Opening Br. Supp. Claim Constr., Ex. C, '473 Patent, Claim 1, Col. 7, ll. 16-26, 36-41; Claim 15, Col. 8, l. 66-Col. 9, l. 12 (claiming a device and a combination comprised of, among other things, an enclosure *and* a

defibrillator mount); *id.*, Claim 1, Col. 7, ll. 36-37; Claim 15, Col. 9, ll. 8-9 (claiming "a defibrillator

mount connected to an interior surface of the enclosure").) Moreover, for the reasons discussed

above, the Court finds that Heartstation relinquished its claim to a mount in which the defibrillator

rests on the bottom of the enclosure during prosecution of the '501 Patent. *See Elkay Mfg. Co. v.

Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999) ("When multiple patents derive from the same

initial application, the prosecution history regarding a claim limitation in any patent that has issued

applies with equal force to subsequently issued patents that contain the same claim limitation.").[3]

In sum, the Court holds that "defibrillator mount" as it is used in claims 1 and 15 of the '473

Patent means a device that: (1) has at least one holding member that positions the defibrillator

within the interior compartment so that it can be readily viewed through the translucent material of

the door; (2) is structurally distinct from the interior surfaces of the enclosure, and (3) raises the

defibrillator off of the bottom of the enclosure.


**Holding Member**

At issue next is the construction of the term "holding member" as used in claims 1 and 15

of the '473 Patent. (*See* Exs. Potter's Opening Br. Supp. Claim Constr., Ex. C, '473 Patent, Claim

1, Col. 7, ll. 36-41; Claim 15, Col. 9, ll. 8-12 ("a defibrillator mount connected to an interior surface

of the enclosure having at least one holding member . . . positioning the defibrillator within the

---

[3]The fact that defibrillator mount has a broader meaning in the '473 Patent does not
shield Heartstation from this disclaimer. The disclaimer – that Heartstation's invention was
distinct from the prior art because the mount raised the defibrillator off of the bottom of the
enclosure – enabled Heartstation to overcome an obviousness rejection of claim 1 of the '501
Patent. Claim 1 of the '473 Patent is just an "obvious broadening . . . or an obvious variant" of
that claim. (Exs. Potter's Opening Br. Supp. Claim Constr., Ex. D12, 4/16/03 Office Action at
2.) Thus, absent the disclaimer, claim 1 of the '473 Patent would be unpatentable as well.

interior compartment such that the defibrillator can be readily viewed through the translucent material of the door." ).) Heartstation contends that holding member is "a means to support a defibrillator." (Pl.'s Initial *Markman* Mem. Regarding Claim Constr. at 17.) Potter says holding member means "a protruding part that 'holds' or 'grasps' the defibrillator" and is "structurally distinct from the interior surfaces (the top, bottom, and side walls) of the enclosure." (Potter's Opening Br. Supp. Claim Constr. at 11.) J.L. defines holding member as a "horizontally outwardly extending element . . . which is narrower than the bracket, as shown in Figure 8 of the '473 patent." (J.L.'s Mem. Supp. Claim Constr. at 13.)

Once again, Heartstation's definition is too broad. Claims 1 and 15 make clear that the holding member is not a means to support a defibrillator but a constituent part of the defibrillator mount. (*See* Exs. Potter's Opening Br. Supp. Claim Constr., Ex. C, '473 Patent, Claim 1, Col. 7, ll. 36-37; Claim 15, Col. 9, ll. 8-9 (claiming "a defibrillator mount connected to an interior surface of the enclosure *having* at least one holding member") (emphasis added).) Further, because the holding member is a part of the mount, and the mount is distinct from the interior surfaces of the enclosure, *see id.*, Claim 1, Col. 7, ll. 16-26, 36-41; Claim 15, Col. 8, l. 66-Col. 9, ll. 12 (claiming "a defibrillator mount connected to an interior surface of the enclosure having at least one holding member" and a combination comprised of an enclosure *and* a defibrillator mount, respectively), the holding member must also be distinct from the interior surfaces of the enclosure.

For the reasons discussed above, however, the claims do not limit holding member to a part that grasps, as Potter contends.

They also do not limit it to a part that is narrower than the mount, as J.L. argues. J.L.'s interpretation is based on figure 8 of the Patent, which is a depiction of one of the embodiments covered by the Patent. (*See id.*, Col. 5, ll. 38-40) ("FIG. 8 shows an alternate embodiment of the

15

defibrillator mount . . . that also connects to an interior surface of the enclosure.").) Depictions of such embodiments do not, however, limit the claims. *Toro Co.*, 199 F.3d at 1301.

In sum, the Court construes "holding member" as used in claims 1 and 15 of the '473 Patent as a part of the defibrillator mount that is structurally distinct from the interior surfaces of the enclosure.

## Held by the Defibrillator Mount

One of the limitations of claim 15 of the '473 Patent is: "a defibrillator held by the defibrillator mount within the interior compartment of the enclosure." (Exs. Potter's Opening Br. Supp. Claim Constr., Ex. C, '473 Patent, Claim 15, Col. 9, ll. 13-14.) For the same reasons it urged in support of its construction of defibrillator mount and holding member, Potter argues that held means "grasped and restrained." (*See* Potter's Opening Br. Supp. Claim Constr. at 12.) For the reasons discussed above, the Court holds that "held" as used in this limitation of claim 15 means supported.

## Secured

The parties also dispute the meaning of the word "secured" as used in the following language in claims 8 and 14 of the '501 Patent: "[T]he defibrillator secured within the interior compartment of the enclosure by the defibrillator mount." (Exs. Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Claim 8, Col. 7, ll. 14-16; Claim 14, Col. 8, ll. 5-7.) Heartstation does not define secured in the Patent but says it means supported. (*See* Pl.'s Initial *Markman* Mem. Regarding Claim Constr. at 13.) In defendants' view, secured means held fast or made fast or firm. (*See*

16

Potter's Opening Br. Supp. Claim Constr. at 9; J.L.'s Mem. Supp. Claim Constr. at 11.) The Court agrees with defendants.

The ordinary meaning of secure is "[t]o make firm or tight; fasten." *See* http://dictionary.reference.com/search?q=secure; *see also Eazypower v. Vt. Am. Corp.*, No. 01 C 3252, 2003 WL 1720024, at *4 (N.D. Ill. Mar. 8, 2003) (holding that ordinary meaning of secure is "to be made fast or firm, as by attaching") (quotation omitted).[4] That meaning is consistent with the specification, which variously provides that "the defibrillator mount should hold," or "should be capable of holding," "the defibrillator in place and allow for little movement of the defibrillator within the interior compartment." (Exs. Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Col. 2, ll. 35-39; Col. 4, ll. 7-10.)

Heartstation's only argument against using the ordinary meaning of secured is that doing so would defeat the Patent's objective of easy defibrillator removal. As discussed above, however, the mounting device described in claim 1 need not – and, read in the context of the Patent, cannot – render the defibrillator "immovable or . . . mov[able] only with the greatest of difficulty," as Heartstation contends. (*See* Pl.'s Reply *Markman* Mem. Regarding Claim Constr. at 4.) Thus, the Court interprets "secured," as it is used in claims 8 and 14 of the '501 Patent, to mean held firm.

---

[4]In *Eazypower*, this Court did not, as Heartstation contends, define held fast as "immovable or moved only with the greatest of difficulty." (*See* Pl.'s Initial *Markman* Mem. Regarding Claim Constr. at 14.) Rather, we noted that the defendant, whose proffered interpretation the Court rejected, had "submit[ted] dictionary definitions of the word 'secured' to mean 'to make fast: tie down,' and of the word 'fast' to mean 'firmly fixed, immovable or moved only with the greatest difficulty.'" *Id.* at *3 (citations omitted).

## Closes the Activation Switch

In relevant part, claims 1, 8, 14 and 21 of the '501 Patent and claims 1, 8 and 17 of the '473 Patent claim:

> an activation switch . . . connected to the enclosure and connected in circuit to the visual alarm signal and the audible alarm signal [or alarm means], the activation switch positioned in operative relation to a wall section and the door section of the enclosure such that the opening of the door section closes the activation switch activating the visual alarm signal and the audible alarm signal [or alarm means].

(Exs. Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Claim 1, Col. 6, ll. 14-21; Claim 8, Col. 7, ll. 7-12; Claim 14, Col. 7, ll, 62–67; Claim 21, Col. 8, ll. 52-57; *id.*, Ex. C, '473 Patent, Claim 1, Col. 7, ll. 29-34; Claim 8, Col. 8, ll. 21-26; Claim 17, Col. 9, ll. 17-23.)

The parties dispute the meaning of the phrase "such that the opening of the door section closes the activation switch." Heartstation's construction is "an alarm is activated when the door is opened thereby closing the electrical circuit." (Pl.'s Initial *Markman* Mem. Regarding Claim Constr. at 6-7.) Among the alternatives offered by Potter is: "the activation switch causes the completion or 'closing' of an [sic] previously open electrical circuit." (Potter's Resp. Br. Supp. Claim Constr. at 13.)[5]

Both interpretations capture the mechanics of the system: the alarm is activated when an open electrical circuit is closed. But both parties' interpretations are confusing; Heartstation's makes no reference to the activation switch and Potter's makes no reference to the door. According to both the claims and the specifications, the disputed phrase means: when the door to the enclosure opens, the activation switch closes the electrical circuit, thereby triggering the alarm. (*See* Exs.

---

[5]J.L. does not offer a construction of this phrase.

Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Col. 2, ll. 48-53; *id.*, Ex. C, '473 Patent, Col. 3, ll. 60-65.) Accordingly, that is the construction the Court adopts.

**Alarm Means**

On of the elements of claims 8, 14 and 21 of the '501 Patent and claims 1 and 8 of the '473 Patent is an "alarm means connected to the enclosure." (*Id.*, Ex. A, '501 Patent, Claim 8, Col. 7, l. 6; Claim 14, Col. 7, l. 61; Claim 21, Col. 8, l. 51; *id.*, Ex. C, '473 Patent, Claim 1, Col. 7, l. 28; Claim 8, Col. 8, l. 20.) The use of the word "means" raises the rebuttable presumption that this element is a means-plus-function limitation. *Kemco Sales, Inc. v. Control Papers Co., Inc.*, 208 F.3d 1352, 1361 (Fed. Cir. 2000); *see* 35 U.S.C. § 112 ¶ 6 ("An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."). That presumption is rebutted, however, if the "claim element that uses the word 'means' . . . recites no function corresponding to the means." *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999). Heartstation says that is the case here.

The Court disagrees. Though no function is stated for the alarm means, the term itself describes its function: to alarm. *See Leviton Mfg. Co., Inc. v. Universal Sec. Instruments, Inc.*, Nos. Civ. AMD-03-1701 & Civ. AMD-03-2137, 2005 WL 936990, at *11 (D. Md. Aug. 22, 2005) (construing "reset means" and noting that the word reset "connotes a function."); *Stairmaster Sports/Med. Prods., Inc. v. Groupe Procycle, Inc.*, No. Civ. A. 97-396 MMS, 1998 WL 290296, at *7 (D. Del. May 20, 1998) ("The Court also finds that the function of the 'drive means' is self-definitionally 'to drive.'"). The functionally-descriptive nature of the word alarm, distinguishes it

19

from claim limitations that have been held not to recite a function. *See, e.g., York Prods., Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1573-74 (Fed. Cir. 1996) (construing "means formed on the upwardly extending liner sidewall portions including a plurality of spaced apart, vertically extending ridge members protruding from the liner sidewall portions and forming load locks in gaps separating adjacent ones of the ridge members" and holding that "[t]he claim language . . . does not link the term 'means' to a function."). Thus, the Court holds that the phrase "alarm means" is a means-plus-function limitation subject to 35 U.S.C. § 112 ¶ 6.

In construing a limitation pursuant to that section, we must first determine what the claimed function is and then identify the structures disclosed in the specification that perform the function. *Kemco Sales Inc.*, 208 F.3d at 1361. As noted above, the function of the alarm means is to alarm. The structure disclosed in the specifications to perform that function is "an alarm circuit with a visual alarm and an audible alarm signal." (Exs. Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Col. 2, ll. 43-45; *id.*, Ex. C, '473 Patent, Col. 3, ll. 55-57.) Thus, that is the meaning of "alarm means."

### Remote Alarm Means

Claims 4, 13 and 18 of the '501 Patent and claims 6 and 13 of the '473 Patent contain the following language:

> The protective defibrillator storage device [or emergency defibrillator station] . . . further comprising a relay means and a remote alarm means, the relay means connected in circuit to the activation switch and the remote alarm means, wherein the closing of the activation switch triggers the relay means to produce an electrical signal causing the remote alarm means to activate.

(*Id.*, Ex. A, '501 Patent, Claim 4, Col. 6, ll. 44-49; Claim 13, Col. 7, ll. 43-48; Claim 18, Col. 8, ll. 28-33; *id.*, Ex. C, '473 Patent, Claim 6, Col. 8, ll. 1-6; Claim 13, Col. 8, ll. 56-61.) In addition,

20

claim 21 of the '501 Patent claims: "remote alarm means connected to the activation switch, wherein the closing of the activation switch triggers an electrical relay causing the remote alarm means to activate." (*Id.*, Ex. A, '501 Patent, Claim 21, Col. 8, ll. 58-61.) Once again, the use of the word "means" triggers the presumption that this is a means-plus-function limitation. *Kemco Sales, Inc.*, 208 F.3d at 1361. Moreover, as with alarm means, the function of remote alarm means is inherent in the phrase: to alarm at a remote location. The question, then, is what structure is disclosed in the specification that corresponds to that function?

The answer is none, specifically. The following is the only reference to a remote alarm in the Patent specifications: "The closing of the activation switch also sends a triggering voltage through pin 9 and 10 of the PC terminal block TB1 which can be used to trigger a remote alarm." (*See* Exs. Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Col. 5, ll. 12-15; *id.*, Ex. C, '473 Patent, Col. 6, ll. 40-43.) Because the specification discloses no structure specifically for remote alarm means, defendants say that element should be construed as having none.

Heartstation, of course, disagrees. In its view, remote alarm means should be construed as having the same structure as alarm means. Generally, "[claim] interpretations that render some portion of the claim language superfluous are [generally] disfavored." *Power Mosfet Tech., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004). If, however, neither "the plain meaning [of the term] nor the patent itself commands a difference in scope between two terms, they may be construed identically." *Id.*; *see Pickholtz v. Rainbow Tech., Inc.*, 284 F.3d 1365, 1373 (Fed. Cir. 2002) (construing "computer" and "computer system" identically because "the patent . . . provide[d] no indication that the two terms mean different things").

21

Such is the case here. The modifier remote speaks to the location of the alarm means not its structure. Thus, the plain meaning of the term remote alarm means does not suggest that its structure is any different from that of the alarm means claim element.

Nor do the claims or specification of the '473 Patent. Claim 21 differentiates between the alarm means element and the remote alarm means element only by location. (*Compare* Exs. Potter's Opening Br. Supp. Claim Constr., Ex. C, '473 Patent, Claim 21, Col. 8, ll. 51-57 (claiming "alarm means connected to the enclosure" and "an activation switch . . . connected in circuit to the alarm means . . . such that the opening of the door section closes the activation switch activating the alarm means") *with id.*, ll. 58-61 (claiming "remote alarm means connected to the activation switch, wherein the closing of the activation switch triggers an electrical relay causing the remote alarm means to activate").) The specification also does not substantively distinguish between the two. In fact, though it discusses "alarm means" in some detail, the specification says virtually nothing about remote alarm means. That silence strongly suggests that the only difference between remote alarm means and alarm means is location.

In sum, the Court concludes that the structure of the "remote alarm means" is the same as that of the alarm means: "an alarm circuit with a visual alarm and an audible alarm signal."

**Integral Alarm System & Integral Alarm Means**

In relevant part, the preambles to claims 1 and 8 of the '473 Patent describe the claimed invention as "[a] protective defibrillator storage device with an integral alarm system . . . ." (*Id.*, Claim 1, Col. 7, ll. 16-17; Claim 8, Col. 8, ll. 11-12.) Generally, preambles are not construed:

> If . . . the body of the claim fully and intrinsically sets forth the complete invention, including all of its limitations, and the preamble offers no distinct definition of any of the claimed invention's limitations, but rather merely states, for example, the

22

purpose or intended use of the invention, then the preamble is of no significance to claim construction because it cannot be said to constitute or explain a claim limitation.

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). If, however, "the preamble recites limitations of the claim, or . . . is necessary to give life, meaning, and vitality to the claim," it should be construed as if it were part of the claim. *Id.* (quotation omitted). Defendants say the preambles of claims 1 and 8 fall into the latter category.

The Court disagrees. Read in context of the claims, the preambles of claims 1 and 8 simply describe the claimed invention. The preambles, for example, refer to "an integral alarm system," but "alarm system" is not an element of the claims. Moreover, the preambles say the alarm system is "for warning others of a potential cardiac arrest incident," a general statement of the alarm's purpose rather than a limitation on any element actually recited in the claims. In short, the preambles of claims 1 and 8 are gratuitous descriptions of one aspect of the invention not a limitation on any element of the claims. Thus, the word integral does not impact the construction of claims 1 and 8.

The situation is different for claim 16, however, because the phrase "integral alarm means" appears in the claim itself not just the preamble. That claim states: "The combination of claim 15 [defibrillator storage device and defibrillator] further comprising an integral alarm means connected to the enclosure." (Exs. Potter's Opening Br. Supp. Claim Constr., Ex. C, '473 Patent, Claim 16, Col. 9, ll. 15-16.) Heartstation argues that, even in this context, the word integral is simply descriptive, "underscor[ing] the importance of the alarm system." (Pl.'s Initial *Markman* Mem. Regarding Claim Constr. at 19.)

If that is true, then the terms integral alarm means and alarm means are synonymous, rendering the word integral superfluous. Though, as noted above, such interpretations are generally

not favored, neither the plain meaning of the word integral nor the claims and specification of the '473 Patent dictate a different result. The plain meaning of integral is not necessarily unitary, as defendants contend. In fact, though that is one definition of the word, the primary definition is "[e]ssential or necessary for completeness; constituent." *See* http://dictionary.reference.com/search?q=integral. Consequently, the plain meaning of the word does not mandate interpreting "integral alarm system" as a one-piece alarm system.

Defendants' interpretation is not required by the Patent either. The phrase integral alarm means does not appear anywhere in the specification. Rather, the specification refers to "an alarm system," (Exs. Potter's Opening Br. Supp. Claim Constr., Ex. C, '473 Patent, Col. 1, ll. 11-12; Col. 2, ll. 55-56), "an integral alarm system," (*id.*, Col. 3, ll. 7-10), and, most often, "alarm means," (*id.*, Col. 3, l. 52-Col. 4, l. 7; Col. 4, ll. 18-20; Col. 5, ll. 44-58, 65-66; Col. 6, ll. 9-17). Thus, the specification gives no indication that integral alarm means is something different than alarm means.

The claims of the Patent also do not suggest a different definition. Claim 16 depends on claim 15, which claims:

> A protective defibrillator storage device in combination with a defibrillator, the combination comprising:
>
> an enclosure comprising a plurality of wall sections, a top section, a bottom section and a door section, the wall sections, top section, bottom section and door section defining an interior compartment of sufficient size to house a defibrillator the door partially constructed of a translucent material allowing the interior compartment to be viewed with the door closed.
>
> a defibrillator mount connected to an interior surface of the enclosure having at least one holding member positioning the defibrillator within the interior compartment such that the defibrillator can be viewed though the translucent material of the door; and
>
> a defibrillator held by the defibrillator mount within the interior compartment of the enclosure.

(*Id.*, Claim 15, Col. 8, l. 66-Col. 9, l. 14.) What claim 15 does not claim is any kind of alarm means. That element is added by claim 16: "The combination of claim 15 further comprising an integral alarm means connected to the enclosure." (*Id.*, Claim 16, Col. 9, ll. 15-16.) If alarm means were an element of claim 15, that would strongly suggest that integral alarm means of claim 16 was something different. *See Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) (stating that "[u]nder the doctrine of claim differentiation each claim in a patent is presumptively different in scope."). The absence of an alarm means element from claim 15, however, suggests that there is no difference between the integral alarm means of claim 16 and the alarm means recited in the other claims of the Patent. The Court, therefore, holds that "integral alarm means" of claim 16 of the '473 Patent is the same as "alarm means" of claims 1 and 8 of that Patent.

**Strobe Light**

Claims 6, 11, 16 and 23 of the '501 Patent and claims 4, 11 and 20 of the '473 Patent claim an alarm means comprised, in part, of a strobe light. (*See* Exs. Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Claim 6, Col. 6, ll. 54-59; Claim 11, Col. 7, ll. 31-35; Claim 16, Col. 8, ll. 17-21; Claim 23, Col. 9, ll. 10-14; *id.*, Ex. C, '473 Patent, Claim 4, Col. 7, ll. 56-60; Claim 11, Col. 8, ll. 44-48; Claim 20, Col. 10, ll. 12–15.) Heartstation says that term means "a light that flashes." (Pl.'s Initial *Markman* Mem. Supp. Claim Constr. at 12 (quotation omitted).) Potter says it means "a light that uses a flash tube for high-speed illumination." (Potter's Resp. Br. Claim Constr. at 19) (quotation omitted).[6]

---

[6]J.L. offers no construction of this term.

Potter's construction is a "plain meaning" interpretation gleaned from a dictionary. But another dictionary definition of strobe light is "[a] flash lamp that produces high-intensity short-duration light pulses by electric discharge in a gas," a definition that is closer to Heartstation's. *See* http://dictionary.reference.com/search?q=strobe%20light. The Patent provides no guidance as to which plain meaning applies nor does the prosecution history. Consequently, we must turn to the extrinsic evidence.

William Sears, one of the inventors and a man skilled in the art of electronics, testified that not all flashing lights are strobe lights. (Potter's Resp. Br. Supp. Claim Constr., Ex. V, Sears Dep. at 31-32.) Rather, he said, a strobe light is one that "through a means of electronics . . . puls[es] on and off." (*Id.* at 31.) That definition is consistent with, though somewhat narrower than, the dictionary definitions, and with the alarming function of the strobe as set forth in the specifications. Thus, the Court adopts Sears' definition of strobe light.

**Activation Switch**

Claim 21 of the '501 Patent claims an emergency defibrillation station comprising, among other things, "an activation switch . . . connected in circuit to the alarm means" and "remote alarm means connected to the activation switch, wherein the closing of the activation switch triggers an electrical relay causing the remote alarm means to activate." (Exs. Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Claim 21, Col. 8, ll. 42-43, 52-61.) J.L. contends that claim 21, properly construed, claims a single activation switch that is electrically connected to both the alarm means and the remote alarm means. (J.L.'s Mem. Supp. Claim Constr. at 15.)[7]

---

[7]Potter offers no construction of this term.

Certainly, claim 21 refers to activation switch in the singular. (*See* Exs. Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Claim 21, Col. 8, ll. 52-61.) But the Federal Circuit "has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). Thus, standing alone, the claim language does not limit the claimed device to a single activation switch.

The specification of the '501 Patent also describes the invention as having one activation switch. (*See, e.g.,* Exs. Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Col. 2, ll. 48-50 ("An activation switch for triggering the alarm means is connected to the door section and operatively positioned to contact an enclosure wall when the door is closed."); Col. 4, ll. 38-41 ("In the preferred embodiment, an activation switch . . . for triggering the alarm means is connected to the door section . . . and operatively positioned to contact a wall section . . . when the door section . . . is closed."); Col. 4, ll. 41-44 ("In the preferred embodiment of the invention, the activation switch . . . is a pressure switch which remains open as long as there is adequate pressure on the switch."); Col. 5, ll. 12-15 ("The closing of the activation switch also sends a triggering voltage through pin 9 and 10 of the PC terminal block TB1 which can be used to trigger a remote alarm.").) Most of the references to a single activation switch, however, appear in the description of the preferred embodiment. As noted above, however, claims are not limited by the preferred embodiment described in a patent. *Toro Co.*, 199 F.3d at 1301.

There is nothing in the Patent or its prosecution history that suggests the invention is limited to the one-switch preferred embodiment. Moreover, J.L. has not offered any extrinsic evidence that supports such a limitation. Accordingly, the Court does not interpret claim 21 as being limited to a single activation switch.

**Timing Means**

In relevant part, claims 3, 12, 17 and 24 of the '501 Patent claim: "a timing means . . . connected in circuit to the siren, buzzer and the activation switch, the timing means initially activating the siren after the activation switch is closed and then activating the buzzer and deactivating the siren after a set period of time." (Exs. Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Claim 3, ll. 37-43; Claim 12, Col. 7, ll. 36-42; Claim 17, Col. 8, ll. 22-28; Claim 24, Col. 10, ll. 1-7.) Similarly, claims 5, 12 and 21 of the '473 Patent claim: "the timing means connected in circuit to the siren, buzzer and the activation switch, the timing means initially activating the siren when the activation switch switches to a closed position and then activating the buzzer and deactivating the siren after a set period of time." (*Id.*, Ex. C, '473 Patent, Claim 5, Col. 7, ll. 61-67; Claim 12, Col. 8, ll. 49-55; Claim 21, Col. 10, ll. 16-22.) J.L. and Heartstation agree that "timing means" is a means-plus-function limitation. (*See* Pl.'s Initial *Markman* Br. Regarding Claim Constr. at 9.)[8] Thus, we must determine what the claimed function of the timing means is and then identify the structures disclosed in the specification that perform that function. *Kemco Sales Inc.*, 208 F.3d at 1361.

According to the claims, the function of the timing means is to activate the siren after the activation switch is closed and then activate the buzzer and deactivate the siren after a set period of time. The specification describes the timing means as follows:

> Upon activation, pin S on U3 is held Hi for 30 seconds. Pin 5 causes pin 10 of U4, a Schmitt Trigger, to go Lo which causes Q6 to pull in relay coil K1 completing a circuit between a 12 volt battery and the strobe/siren device 20, activating the strobe/siren device 20. After 30 seconds, pin 5 of U3 goes Lo and pin 9 of U3 goes Hi causing pins 10 of U4 to go Hi and causing pin 12 of U4 to go Hi. The relay coil K1 is then released by Q6 and the circuit between the strobe/siren device and the 12

---

[8]Potter does not offer a construction of this element.

28

volt battery is broken, deactivating the strobe/siren device. The output of pin 12 on U4 is timed by C9 and R22 to cause the output of pin 11 of U4 to oscillate, driving the transistor on Q5 to activate the buzzer.

(Exs. Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Col. 5, ll. 19-30; *id.*, Ex. C, '473 Patent, Col. 6, ll. 47-59.) In J.L.'s view, that description requires the timing means to deactivate the alarm thirty seconds after activation.

The Court disagrees. The function of the timing means, as set out in the claims, is to activate the alarm and then deactivate it "after a set period of time." Consequently, the thirty-second time lapse between activation and deactivation discussed in the description of the preferred embodiment is part of the function of the timing means, not part of its structure. Therefore, the structure of the timing means consists of the components described in the specification of the '501 Patent at column 5, lines 19 through 30 and in the specifications of the '473 Patent at column 6, lines 47 through 59.

## Low Battery Detection Means

Claims 10, 15 and 22 of the '501 Patent and claims 3, 10 and 19 of the '473 Patent claim a protective defibrillator storage device or emergency defibrillator station comprising:

> a battery operated power source and a low battery detection means, the battery operated power source connected in circuit to the alarm means and the low battery detection means, the low battery detection means connected in circuit to the alarm means, the low battery detection means intermittently activating the alarm means when the battery operated power source delivers a voltage below a set voltage.

(*Id.*, Ex. A, '501 Patent, Claim 10, Col. 7, ll. 22-30; Claim 15, Col. 8, ll. 8-16; Claim 22, Col. 9, ll. 1-9; *id.*, Ex. C, '473 Patent, Claim 3, Col. 7, ll. 47-55; Claim 10, Col. 8, ll. 35-43; Claim 19, Col. 10, ll. 4-11.) Claim 2 of the '501 Patent is identical, except for the language in bold:

> a battery operated power source and a low battery detection means, the battery operated power source connected in circuit to the **key switch** and the low battery detection means, the low battery detection means connected in circuit to the **audible**

29

**alarm signal**, the low battery detection means intermittently activating the **audible alarm signal** when the battery operated power source delivers a voltage below a set voltage.

(*Id.*, Ex. A, '501 Patent, Claim 2, Col. 2, ll. 28-36 (emphasis added).) Heartstation and J.L. agree

that "low battery means" is a means-plus-function element. (*See* Pl.'s Initial *Markman* Mem.

Regarding Claim Constr. at 8.)[9]

The function of the low battery means, according to the claims, is to activate the alarm

intermittently when the battery delivers a voltage below a set level. J.L. contends that the structure

of the low battery means is:

> a device which detects when the battery voltage is below a set voltage and intermittently activate the audible alarm signal of claim 1 and the alarm means of claims 8, 14 and 21 of the '501 patent and the alarm means of claims 1, 8 and 16 of the '473 patent.

(J.L.'s Reply Mem. Supp. Claim Constr. at 18.) Most of that description, however, recites function.

The only structure J.L. describes is "a device." In other words, J.L.'s proposed structure is any

device that performs the function of the low battery means.

J.L.'s proposed structure is too broad. According to the specifications, the structure of this

element is "a low battery detection circuit . . . provided by transistors Q2, Q3 and Q4." (Exs.

Potter's Opening Br. Supp. Claim Constr., Ex. A, '501 Patent, Col. 5, ll. 31-33; *id.*, Ex. C, '473

Patent, Col. 6, ll. 60-62.) Thus, the structure of "low battery means" is at least one transistor

connected in circuit to the alarm means, for claims 10, 15 and 22 of the '501 Patent and claims 3,

10 and 19 of the '473 Patent, and at least one transistor connected in circuit to the audible alarm

signal, for claim 2 of the '501 Patent.

---

[9]Potter does not offer a construction of this term.

## Conclusion

For the foregoing reasons, the disputed claim terms of the '501 and '473 Patents are construed as set forth in this Memorandum Opinion and Order.

**SO ORDERED.**                     **ENTERED:** 11/29/05


**HON. RONALD A. GUZMAN**
**United States District Judge**